**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**


| | | |
|---|---|---|
| **LUCILLE BLAKE,** | ) | **CASE NO.  1:04 CV 2112** |
| | ) | **(Related Case No. 1:05 CV 649)** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **JUDGE DONALD C. NUGENT** |
| | ) | |
| **JOHN POTTER,** | ) | |
| **POSTMASTER GENERAL** | ) | |
| **OF THE UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | **<u>MEMORANDUM OPINION</u>** |


This matter is before the Court on Defendant's Motion for Summary Judgment.
(Document#31).  Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, Defendant John
Potter, Postmaster General of the United States, has petitioned the Court for summary judgment
on Plaintiff's claim of discrimination on the basis of race, pursuant to Title VII of the Civil
Rights Act of 1964 ("Title VII").   For the reasons set forth below, Defendant's Motion for
Summary Judgment is GRANTED.[1]

---

[1]
Ms. Blake also filed a Complaint against the National Postal Mail Handlers Union, Local
304, Case No. 1:05 CV 649, also before this Court.  Ms. Blake's Complaint against the
Union alleges discrimination on the basis of race pursuant to Title VII and breach of the
duty of fair representation.  The Union has filed a Motion for Summary Judgment, which

## FACTS

Plaintiff, Lucille Blake ("Ms. Blake") is a white female employed as a full-time mail handler in the United States Postal Service's Cleveland, Ohio Processing and Distribution Center.  Plaintiff has worked as a mail handler since 1998.  (Plaintiff's Brief in Opposition "Plaintiff's Brief" at p. 2.)  From June 1998 until January 1999, Blake was a part-time flexible mail handler.  (Deposition of Plaintiff Lucille Blake "Blake Depo." at pp. 28-29.)  Since January 1999, Blake has been employed as a full-time mail handler.  (Id.)  As a mail handler, Ms. Blake's duties include loading and unloading trucks, prepping mail, and weighing mail.  (Plaintiff's Brief at p. 2.)  The terms and conditions of Ms. Blake's employment are covered by the collective bargaining agreement between the National Postal Mail Handlers Union ("Union") and the Postal Service.  (Compl. at ¶4; Defendant's Motion for Summary Judgment "MSJ" at p. 2.)  Ms. Blake's positions of employment, and her hours and days off, are subject to a bidding process pursuant to the rules and regulations contained in the applicable collective bargaining agreement. (MSJ at p.2.)[2]

Ms. Blake worked at the Postal Service Processing and Distribution Center ("the Processing and Distribution Center") until she obtained a position at the Cleveland Post Office Annex ("the Annex") through the bidding process.  (Plaintiff's Brief at p.2.)  At the annex, Ms. Blake worked on Tour 2, a 6:00 a.m. to 2:30 p.m. shift, and her scheduled days off were

_____

will be addressed in a separate memorandum opinion and order by the Court.

[2]

This Court has thoroughly reviewed all of the information available to it for purposes of deciding whether summary judgment is appropriate, including the briefs, affidavits and supporting materials submitted by the Parties, and gives deference to evidence presented by the non-moving party, in this case Plaintiff, in the event of any conflict.

Mondays and Tuesdays.  (Blake Depo. at p. 52.)  Ms. Blake later requested that her scheduled

days off be changed to Sundays and Mondays effective May 5, 2001 to June 1, 2001. (Blake

Depo., Exhibit 6.)  She later requested a permanent assignment to Tour 2, with Saturday and

Sunday as scheduled days off.  (Defendant's Exhibit D, Declaration of Joyce Shepherd, Senior

Manager of Distribution Operations, at ¶10.)

Ms. Blake's fourteen-year-old daughter, Rachel, suffers from autism and has recently

been experiencing seizures.  (Plaintiff's Brief at p. 2.)  Rachel attends Lerner Cleveland Clinic

School for Autism as a full-time student.  (Id.)  Beginning in 2001, Plaintiff submitted numerous

"Requests for Temporary Schedule Change for Personal Convenience" to enable her to be

"closely and consistently involved in all aspects" of her daughter's life.  (Plaintiff's Brief at p. 3;

Compl. at ¶7.)   These requests are known as "tri-party agreements" because a temporary

schedule change must be made through an agreement signed by the employee, management, and

the union.[3]  (Compl. ¶7.)

According to the Postal Service and not disputed by Ms. Blake, from March 30, 2001 to

June 7, 2005, Ms. Blake requested approximately 35 temporary schedule changes.  The Postal

Service approved a majority of the temporary schedule changes requested by Ms. Blake.  In

several instances, tri-party agreements requested by Ms. Blake were denied by the Postal Service,

---

[3]

Ms. Blake's manager, Dwayne Brown ("Mr. Brown"), agreed to approve schedule
changes for 30 days at one time, but for no longer than 90 continuous days.  (Defendant's
Motion for Summary Judgment before the EEOC, May 24, 2004, at ¶7.) To obtain a
schedule change for longer than 90 continuous days, Ms. Blake was required to obtain a
permanent schedule change through the bidding process. (Declaration of Lawrence
Zoloty, Exhibit C to Defendant's Motion for Summary Judgment, at ¶7; Declaration of
Joyce Shepherd, Senior Manager of Distribution Operations, Exhibit D to Defendant's
Motion for Summary Judgment, at ¶10.)

citing "needs of service" as the reason for denial.  (See Copies of Tri-Party Agreements, Exhibits to Blake Depo.)  In one instance, although Ms. Blake's request for a schedule change had been denied, she still received Sundays and Mondays off from the period from August 11, 2001 to August 24, 2001.  (Defendant's Motion for Summary Judgment before the EEOC, May 24, 2004, at ¶9.)   When her requests for temporary schedule changes were denied, Ms. Blake used leave without pay, FMLA leave, and annual and sick leave to accommodate her needs.  (Blake Affidavit at ¶7-8.)  Ms. Blake states in her Affidavit that using leave without pay reduces her contribution to the retirement system.  (Id. at ¶9.)

In or around July 2001 or August 1, 2001, Mr. Brown denied Ms. Blake's request for a temporary schedule change because Ms. Blake had already received a continuous 90-day schedule change, from May 5, 2001 to August 3, 2001.  (Defendant's Motion for Summary Judgment before the EEOC, May 24, 2004, at ¶¶ 6-9.) Ms. Blake sought Sunday and Monday off from August 4, 2001 through August 31, 2001.  (Id. at ¶9.)  Even though the request was denied, Ms. Blake still received the desired change of schedule from August 11, 2001 through August 24, 2001.  (Id.)  Ms. Blake was denied a change of schedule on October 11 for operational needs but was granted a change giving her Monday and Friday off for the week of October 6, 2001 through October 12, 2001.  (Id. at ¶10.)  Another change of schedule was granted for the week of November 2001. (Id. at ¶12.)[4]

In August 2002, the Postal Service closed the Annex and abolished Ms. Blake's position

---

[4]

Although she does not specify the date, Ms. Blake states in her affidavit that Mr. Brown told her he would not approve any more tri-parties and, therefore, that she felt it was pointless to apply.  Ms. Blake then used annual or sick leave.  Ms. Blake states that if she had not been "forced" to use sick and annual leave, she would have "saved them for better use at another time."

on Tour 2.  (Blake Deposition at p. 53.)  The Postal Service re-assigned Ms. Blake to the

Processing and Distribution Center, where she was scheduled to work on Tour 3, the 1:30 p.m. to

10:00 p.m. shift.  (Id.)  However, schedule changes were approved that temporarily permitted

Ms. Blake to remain on the Tour 2 shift, from 6:30 a.m. to 2:30 p.m., with Mondays and

Tuesdays scheduled off, while she attempted to obtain a permanent position on that shift through

the bidding process.  (Id. at p. 54.)  Ms. Blake's managers approved the following temporary

schedule changes through tri-party agreements:

> Scheduled days off were changed to Saturdays and Sundays from November 16, 2002 to November 19, 2002, so that Ms. Blake could care for her daughter after surgery.
>
> Ms. Blake's starting time was changed on December 19, 2002 and December 27, 2002, so that she could attend EEO meetings.
>
> Ms. Blake's schedule was changed from March 23, 2003 to March 25, 2003, so that she could attend Medical Emergency Response Team training.
>
> Ms. Blake's scheduled days off were changed to Sundays and Mondays from August 27, 2003 to September 3, 2003 because Ms. Blake's husband was having surgery.
>
> Ms. Blake's starting time was changed on October 17, 2003 so that she could attend a Medical Emergency Response Team meeting.
>
> Ms. Blake's scheduled days off were changed to Sundays and Mondays from October 18, 2003 to October 21, 2003 so that she could attend an EEO proceeding.

(See Copies of Tri-Party Agreements, Exhibits to Blake Deposition.)

In January 2004, after permitting Ms. Blake to work on the Tour 2 shift since August

2002, the Postal Service notified Ms. Blake that, because she had not obtained a position on Tour

2 through the bidding process, she was required to work her scheduled Tour 3 shift.  (Blake

Affidavit at ¶10.)  Ms. Blake alleges in her affidavit that she was transferred to Tour 3 after she

filed EEO charges.  (Id.)  However, the Postal Service approved the following through tri-party

agreements after she was transferred to Tour 3:

> Ms. Blake was permitted to continue the Tour 2 shift from January 24, 2004 to
> June 2004.
>
> Ms. Blake was permitted to work on Tour 2 from July 1, 2004 to September 3,
> 2004.
>
> Ms. Blake's scheduled days off were changed to Tuesdays and Wednesdays
> from July 1, 2004 to September 3, 2004.

(Defendant's Exhibit D.)

Ms. Blake filed EEO complaints when requested temporary scheduling change requests

were denied.  The Postal Service filed a motion for summary judgment with the Administrative

Judge regarding three of Ms. Blake's charges.  (Defendant's Exhibit B.)  The Final Agency

Decision for two of the three charges contained in Ms. Blake's EEO complaint found no

discrimination.  (Compl. at ¶17.)   On the third charge, the parties entered into a settlement

agreement, agreeing that if the Union would approve a tri-party agreement granting Ms. Blake a

schedule change, then the Postal Service would automatically approve the tri-party agreement.

(Id. at ¶18; Blake Depo., Exhibit 9.)  The Postal Service agreed to automatically approve tri-party

agreements for Ms. Blake from September 4, 2004 to September 4, 2005.  (Id.)  However, the

Union did not approve tri-party agreements for her following the settlement agreement.  (Blake

Depo. at p. 74; *Blake v. National Postal Mail Handler's Union Local 304*, No. 1:05 CV 649,

October 14, 2005, Compl. at ¶11.)

Ms. Blake filed her Complaint in this case on October 20, 2004.  In her Complaint, Ms.

Blake alleges discrimination on the basis of race, Caucasian.  Specifically, Ms. Blake claims that

-6-

she made reasonable requests for schedule changes, necessitated by her daughter's medical conditions, which were denied.  Ms. Blake alleges that requests for schedule changes made by similarly situated non-Caucasian employees were granted and that race was a determining factor in the decision to deny Ms. Blake's requests.  In her Affidavit, Ms. Blake refers to the following:

> Marvin Crenshaw, a black, casual mail handler, worked "virtually full-time" on Tour 2 from July 2004 to July 2005.

> Willie Boyd, a black, casual mail handler, worked "virtually full-time" on Tour 2 from November 2004 to July 2005.

> Based upon the work schedules of Mr. Crenshaw and Mr. Boyd, there was plenty of work on Tour 2 to when she was transferred to Tour 3 in November 2004.

> Richard Calhoun, is a black mail handler.

> Dwayne Brown, Ms. Blake's former manager, is black.

> Mike Truett is black.

> Tonia Burgess is black.

> Willie Pittman is black.

> Katrina Love, a black, full-time clerk was on Tour 1 and received two tri-party agreements to work on Tour 2 from August 2, 2004 to September 2, 2004 and from February 1, 2005 to February 29, 2005.

> Tyrone Griggs, is a black, full-time mail handler.  In January 2005, management changed the start and end times of each tour for all employees at the Processing and Distribution Center.  However, Ms. Blake saw him continue to work the previous schedule a few times a week, since January 2005, for more than 90 consecutive days.

> "The most likely explanation that Richard Calhoun, Katrina Love and Tyrone Griggs have been working outside of their bids for so long is that management granted their tri-party requests."

> Joe Caldwell, Ms. Blake's black supervisor told three black mail handlers, who had recently converted from part-time status to unassigned status, that "he had

three positions with Sunday/Mondays off." Ms. Blake claims he knew that she
wanted those days off and smirked at her and feels that he was "gloating."
Monica Brown, a black mail handler, was placed on Tour 2 as an unassigned
regular, although the Manager of Labor Relations, Larry Zoloty, had told Ms.
Blake that they did not want any more unassigned regulars on Tour 2.

William Whiteside, a postal employee and Administrative Vice-President of
Local 304, has a bid on Tour 2 with Fridays and Saturdays off. His bid remains
open although he is not working due to his union position. Larry Zoloty,
Manager of Labor Relations, gave Mike Truett, a black, part-time flexible
employee Whiteside's work even though Ms. Blake had asked to be placed on
unassigned status and work Tour 2.

(Blake Affidavit at ¶¶14-24.)

Although not clear from her Complaint, Ms. Blake's deposition testimony and affidavit
appear to allege a claim for hostile work environment and/or retaliation.[5] Specifically, Defendant
cites the following allegations which Ms. Blake discussed during deposition:

In the spring of 2003, Ms. Blake alleges that her manager reprimanded her for
wearing improper shoes to work.

Ms. Blake claims that when she asked her manager for time to prepare her EEO
complaint, her manager asked "Why do you need this? Why are you coming at
me now? Why are you (sic) this?"

Ms. Blake claims unidentified co-workers hid her timecard.

Ms. Blake claims that a co-worker confronted her when she believed that Ms.
Blake told people that she clocked other employees out for overtime even though
those employees did not work overtime.

Ms. Blake claims that in the summer of 2004, a co-worker named Fatema Parker
told Ms. Blake to stay at home.

_____

[5]

The Postal Service has addressed this issue as a claim for hostile work environment
discrimination.

-8-

Ms. Blake claims that in May 2005, Barbara Payne, a manager of distribution operations, informed Ms. Blake that she could not prepare for her lawsuit during work hours, per Postal Service policy.

(MSJ at p. 14.)  Ms. Blake also claims she was denied opportunities to work overtime hours.[6]

Defendant filed his Motion for Summary Judgment (Document #31) on December 14, 2005.  Defendant argues that Ms. Blake has not experienced an adverse employment action.  Specifically, Defendant asserts that the denial of Ms. Blake's requests for temporary schedule changes does not rise to the level of a "materially adverse change in the terms and conditions of employment."  Defendant also argues that Ms. Blake is unable to identify similarly situated, non-Caucasian employees who were treated more favorably and is therefore unable to satisfy a prima facie case of race discrimination.  Even if Ms. Blake could establish a prima facie case of discrimination or retaliation based on race, Defendant asserts that the Postal Service had legitimate, non-discriminatory reasons for denying the tri-party agreements and overtime requests at issue, specifically the operational needs of the Postal Service.  Finally, Defendant argues that the conduct complained of by Ms. Blake was not severe or pervasive enough to sustain a hostile environment claim.[7]

---

[6]

The Postal Service procedure for scheduling overtime is to allow employees regularly scheduled on the applicable tour, who desire overtime, to sign the Overtime Desired List and to assign overtime to employees from the Overtime Desired List on a rotating basis beginning with the most senior employees.  An employee on a tri-party agreement and from a different tour is not eligible to be scheduled for overtime on the tour to which they had transferred temporarily until the sectional and master list with the regularly assigned employees are exhausted for the day in question. Between July 2004 and December 2004, Ms. Blake worked 117 hours of overtime.  According to Defendant and not disputed by Ms. Blake, Ms. Blake turned down overtime on a regular basis and sometimes left early when called in to work overtime on her days off.

[7]

The last section of Defendant's Motion for Summary Judgment reads "D.  Blake did not

Ms. Blake filed her Response Brief on January 6, 2006.  Ms. Blake claims that she was denied certain tri-party agreements because she is Caucasian and was retaliated against for filing EEO complaints.  Ms. Blake argues that the denial of tri-party agreements by the Postal Service and Ms. Blake's transfer to Tour 3 are adverse employment actions; that she has suffered financially and emotionally as a result of these actions; and, that the actions interfered with her ability and opportunity to care for her daughter.  Ms. Blake alleges that she was treated less favorably than similarly situated, non-white employees in that Defendant approved tri-party agreements for similarly situated mail handlers who are black, and approved a lengthy tri-party for a black, full-time clerk.  Ms. Blake also argues that "background circumstances," specifically, that her supervisory and managers are black, show that the Postal Service engaged in reverse discrimination.  Ms. Blake asserts that the reasons set forth by Defendant for denying the tri-party agreements at issue are pretextual, and also argues that she need not prove pretext because Defendant did not state its reasons for denying the tri-party agreements with reasonable specificity.

Further, Ms. Blake sets forth several other instances in which she believes Defendant discriminated against her, including the following:

> Ms. Blake claims that four full-time employees who are black have not been held to the 90 consecutive-day limit for tri-party agreements, including Willie Pittman, Tyrone Griggs, and Richard Calhoun.  Ms. Blake does not discuss the fourth employee.

> Ms. Blake claims that although she was told she must state reasons for applying for a tri-party agreement, black mail handlers Pam Campbell and John Lang

---

exhaust her administrative remedies with respect to her newly leveled harassment claims."  However, the section discusses only the issue of hostile environment. Therefore, the Court will address the issue of hostile environment.

were granted tri-party agreements despite the absence of reasons.

Ms. Blake claims that Monica Brown, a black mail handler, was placed on tour 2 as an unassigned regular although the Manager of Labor Relations, Larry Zoloty, had told Ms. Blake that they did not want any more unassigned regulars on Tour 2.

Ms. Blake claims that Defendant permitted three black, casual and part-time flexible mail handlers to work on schedules that it denied to Ms. Blake, including Marvin Crenshaw, Willie Boyd, and Mike Truett.

Ms. Blake claims that based upon the work schedules of Mr. Chrenshaw, Mr. Boyd, and Mr. Truett, there was plenty of work on Tour 2 to when she was transferred to Tour 3 in November 2004.  Defendant could have kept her on as an unassigned regular but instead assigned three black employees to Tour 2.

(Plaintiff's Brief at pp. 10-12.)

In addition to the above, Ms. Blake claims that several other factors constitute circumstantial evidence of pretext.  First, Ms. Blake asserts that Defendant's in-house physician notified Defendant that Ms. Blake should have an indefinite change of schedule to care for her daughter.  However, Defendant did not effectuate such a change.  Second, Ms. Blake claims that her supervisor at the Annex, Joe Caldwell, who is Black, smirked at her while offering three black mail handlers positions with days off on Sunday and Monday.  Third, Ms. Blake claims that Mr. Nesser, a manager of Tour 2, permitted a black mail handler to leave Tour 2 "even though he acknowledged that he needed more people."  (Plaintiff's Brief at p. 13.)

Defendant filed his Reply Memorandum on January 13, 2006.  Defendant asserts that Ms. Blake's requests for schedule changes are in fact attempts to circumvent the applicable labor agreement in order to assign Ms. Blake the days and hours of her preference.  Defendant provides the following arguments:

-11-

Monica Brown's position duty assignment was abolished pursuant to a collective bargaining agreement because she was working as a supervisor for four months. She is not an appropriate comparator to Ms. Blake.

While Willie Pittman was on a tri-party for more than 90 days, Ms. Blake did not work her assigned schedule for most of 2004.  Although she was required to file a new request form, she received hours and days off for months and months at a time.

Michael Truett is a part-time flexible mail handler, not a full-time regular.  Mr. Truett does not have a bid position or assigned hours and can be assigned any shift.  No tri-party agreement is needed because he has no bid and no guaranteed hours.

Mr. Crenshaw and Mr. Boyd are non-career employees so they are not comparable to Ms. Blake.

Katrina Love, a clerk, is covered by an entirely different collective bargaining agreement than Ms. Blake and performs different work than a mail handler. Because there are four times as many clerks as mail handlers, it may be easier for the Postal Service to grant clerks tri-party agreements, given staffing constraints.

Tyrone Griggs has been granted tri-party agreements to alter the start time of his shift by one hour.  However, Ms. Blake has never been denied a request to change her start time.  She has been denied requests to have weekend days off and work daytime hours.  Therefore, the two are not comparable.

Ms. Blake has produced no evidence that Richard Calhoun is working outside of his bid or that he is on a tri-party agreement.  Further, Ms. Blake claims that Mr. Calhoun is arriving and leaving late by two hours.  Ms. Blake is asking to work the day shift and have weekends off which is not comparable.

The Equal Employment Opportunity Commission has determined that Ms. Blake, a full-time regular mail handler, is not similarly situated to casual employees, part-time flexible employees, and clerks covered by different collective bargaining agreements.

(Defendant's Reply Brief at pp. 2-4.)

Finally, Defendant points to the fact that Ms. Blake has been continuously advised of the options available to her, including a bid pursuant to the applicable collective bargaining

-12-

agreement bidding procedures for a position on Tour 2 or a position on another Tour with weekend days off; leave without pay, leave under the Family Medical Leave Act, or annual and sick leave to allow her to spend time with her daughter; continued requests for tri-party agreements; or, seek alternative employment that would give her a job with a traditional schedule and more flexibility.

### SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  The burden of showing the absence of any such "genuine issue" rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex v. Catrett*, 477 U.S. 317, 323 (1986) (citing FED. R. CIV. P. 56(c)).  A fact is "material" only if its resolution will affect the outcome of the lawsuit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards.  The court will view the summary judgment motion in the light most favorable to the party opposing the motion.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of their case.  *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322).  Accordingly, "[t]he mere existence of

-13-

a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (citing *Anderson*, 477 U.S. at 252). Moreover, if the evidence presented is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson*, 477 U.S. at 249-50 (citations omitted).

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party. The nonmoving party may not simply rely on its pleadings, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995). FED. R. CIV. P. 56(e) states:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

The Federal Rules identify the penalty for the lack of such a response by the nonmoving party as an automatic grant of summary judgment, where otherwise appropriate. *Id.*

Though parties must produce evidence in support of and in opposition to a motion for summary judgment, not all types of evidence are permissible. The Sixth Circuit has concurred with the Ninth Circuit that "'it is well settled that only admissible evidence may be considered by the trial court in ruling on a motion for summary judgment.'" *Wiley v. United States*, 20 F.3d 222, 225-26 (6th Cir. 1994) (quoting *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988)). FED. R. CIV. P. 56(e) also has certain, more specific requirements:

> [Rule 56(e)] requires that affidavits used for summary judgment purposes be made on the basis of personal knowledge, set forth admissible evidence, and show that the affiant is competent to testify. Rule 56(e) further requires the party to attach sworn or certified copies to all documents referred to in the affidavit.

-14-

> Furthermore, hearsay evidence cannot be considered on a motion for summary judgment.

*Wiley*, 20 F.3d at 225-26 (citations omitted).  However, evidence not meeting this standard may be considered by the district court unless the opposing party affirmatively raises the issue of the defect.

> If a party fails to object before the district court to the affidavits or evidentiary materials submitted by the other party in support of its position on summary judgment, any objections to the district court's consideration of such materials are deemed to have been waived, and [the Sixth Circuit] will review such objections only to avoid a gross miscarriage of justice.

*Id*. at 226 (citations omitted).

As a general matter, the district judge considering a motion for summary judgment is to examine "[o]nly disputes over facts that might affect the outcome of the suit under governing law." *Anderson*, 477 U.S. at 248.  The court will not consider non-material facts, nor will it weigh material evidence to determine the truth of the matter. *Id.* at 249.  The judge's sole function is to determine whether there is a genuine factual issue for trial; this does not exist unless "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.*

In sum, proper summary judgment analysis entails "the threshold inquiry of determining whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

-15-

## DISCUSSION

**A.      Race Discrimination.**

In her Complaint, Plaintiff claims she made reasonable requests for schedule changes, necessitated by her daughter's medical conditions, which were denied.  Ms. Blake alleges that requests for schedule changes made by similarly situated non-Caucasian employees were granted and that race was a determining factor in the decision to deny Ms. Blake's requests.

Title VII prohibits employers from discriminating against employees on the basis of race. 42 U.S.C. § 2000e.  "It is well established that the burden is on an employment discrimination plaintiff to establish a *prima facie* case of discrimination."  *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (citations omitted).

Where the plaintiff does not have direct evidence of discrimination, courts use a burden-shifting approach. The Supreme Court explained:

> First, the plaintiff has the burden of proving by the preponderance of the evidence
> a prima facie case of discrimination. Second, if the plaintiff succeeds in proving
> the prima facie case, the burden shifts to the defendant "to articulate some
> legitimate, nondiscriminatory reason for the employee's rejection." Third, should
> the defendant carry this burden, the plaintiff must then have an opportunity to
> prove by a preponderance of the evidence that the legitimate reasons offered by
> the defendant were not its true reasons, but were a pretext for discrimination.

*Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252-53 (1981) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 804 (1973)).  To establish a prima facie case of race discrimination under *McDonnell Douglas* and *Burdine,* the plaintiff must prove:  (1) he is a member of a protected class; (2) he was subjected to an adverse employment action; (3) he was qualified; and, (4) he was treated differently that similarly-situated employees for the same or similar conduct.  *See Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.,* 176 F.3d 921,

-16-

928 (6th Cir. 1999) (citing *Mitchell v. Toledo Hospital*, 964 F.2d 577, 582-83 (6th Cir. 1992)).

Additionally, the Sixth Circuit has adopted the following standard in cases involving claims of reverse discrimination:

> A prima facie case of "reverse discrimination" is established upon a showing [1] that "background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority," . . . and upon a showing [2] that the employer treated differently employees who were similarly situated but not members of the protected class.

*Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 801 (6th Cir. 1994) (citations omitted.)

### 1.    Adverse Employment Action

Ms. Blake has presented no evidence that she was subjected to an adverse employment action.  An adverse employment action is defined as a "materially adverse change in the terms and conditions of employment." *Hollins v. Atlantic Co.,* 188 F.3d 652, 662 (6th Cir. 1999). *De minimis* employment actions are not actionable; the "change in employment conditions 'must be more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Kocsis v. Multi-Care Mgmt., Inc.,* 97 F.3d 876, 886 (6th Cir. 1996) (citation omitted).

At least two courts have examined situations in which a plaintiff postal employee argued that the Postal Service's refusal to authorize a temporary schedule change constituted adverse employment action.  *See Crumpton v. Potter*, 305 F. Supp. 2d 465 (E.D. Pa. 2004); *Bascos v. Henderson*, No. 97 C 4329, 1999 U.S. Dist. LEXIS 8209 (N.D. Ill. May 14, 1999).  Both courts determined that the refusal to grant a schedule change does not rise to the level of adverse action necessary to sustain a Title VII claim.  In *Crumpton*, the plaintiff asked for a temporary schedule

-17-

change, which was denied.  The court stated that the denial of a request for a temporary schedule

change failed to "rise to the severity of an adverse employment action."  305 F. Supp. 2d at 475.

In *Bascos*, the plaintiff claimed that the Postal Service discriminated against him by denying his

request to change his scheduled shift from the afternoon shift to the day shift.  The plaintiff in

*Bascos*, like Ms. Blake, wanted to be assigned to Tour 2 so that he could be at home with his

children and to help with his own medical issues.  *Bascos,* 1999 U.S. Dist. LEXIS 8209, at *2-*6.

The Court in *Bascos* stated as follows:

> This is a far cry from incidents such as demotions, cuts in pay, or reductions in
> responsibility.  There was no effect on his seniority, pay, benefits, or
> responsibility.  Whether Bascos works during the day or at night is a matter of
> convenience.  It is not materially adverse, and the court finds that Bascos cannot
> establish a prima facie case.

*Bascos*, 1999 U.S. Dist. LEXIS 8209, at *16.

In this case, a majority of Ms. Blake's numerous requests for tri-party agreements to

temporarily change her work schedule have been granted since April 2001.  Far fewer have been

denied.  It appears from the evidence presented by both Parties that Defendant attempted to

accommodate Ms. Blake's needs when possible.  In denying some of her requests for a temporary

schedule change, the Postal Service has not effectuated a materially adverse change to the terms

of Ms. Blake's employment.  Rather, on limited occasions they have denied Ms. Blake's requests

to alter her schedule, thus preserving the conditions and terms of her employment as

contemplated through the collective bargaining agreement and bidding process.  There was no

effect on her seniority, pay, benefits, or responsibilities.[8]   There has been no evidence presented

---

[8]

Ms. Blake claims that she needed to use unpaid leave because the Postal Service denied
her requests for temporary schedule changes and, therefore, that her retirement benefit

-18-

that Defendant must circumvent the collective bargaining agreement and bidding process in order to allow Ms. Blake to create her own schedule.

As noted by Defendant, Ms. Blake has the option of bidding for a position on a different tour which would allow her to achieve her desired schedule, or she may continue to request tri-party agreements to temporarily modify her schedule. Further, although she may feel that her sick and annual leave could be better used for other purposes, Ms. Blake may use annual and sick leave, as well as leave without pay, and FMLA leave in order to accommodate care for her daughter. While Ms. Blake's personal situation may require her to deplete her paid annual and sick leave days, and use unpaid leave, in the event that a tri-party agreement is not approved, the denial of a voluntary request to modify the terms of conditions of her employment does not rise to the level of adverse employment action necessary to sustain a Title VII claim.

**2.      Similarly Situated Employees.**

Even if the denial of a request to temporarily and voluntarily modify her schedule constituted an adverse employment action, which this Court has determined it does not, Ms. Blake has failed to present evidence that she was treated differently than similarly situated black employees.

was reduced as a result of having to use unpaid leave. However, the evidence shows that Ms. Blake was granted numerous temporary schedule changes. Her decision to use unpaid leave in those instances in which she could not secure a temporary schedule change was voluntary and was not mandated by the Postal Service. Employees have the option to use unpaid and FMLA leave, in appropriate circumstances, in order to secure time off without fear of job loss. There is no requirement that employees be compensated in terms of retirement benefit for unpaid leave.

-19-

> In order for two or more employees to be considered similarly-situated for purposes of creating an inference of disparate treatment in a [reverse discrimination case], the plaintiff must prove that all of the relevant aspects of his employment situation are "nearly identical" to those of the [black employee] who he alleges [was] treated more favorably. The similarities between the plaintiff and the [black] employee must exist "in all relevant aspects of their respective employment circumstances." Differences in job title, responsibilities, experience, and work record can be used to determine whether two employees are similarly situated.

*Leadbetter v. Gilley*, 385 F.3d 683, 691 (6th Cir. 2004).

A plaintiff must show that employees who are alleged to be similarly situated are similarly situated in all respects. *Mitchell,* 964 F.2d at 583 (citing *Stotts v. Memphis Fire Dep't,* 858 F.2d 289 (6th Cir. 1988)).  That is, the similarly-situated individuals with whom the plaintiff seeks to compare her treatment "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id.*  The circumstances surrounding the denial of Ms. Blake's requests for tri-party agreements must be "nearly identical" with those surrounding the employees alleged to have been treated more favorably.  *Kimble v. Intermetro Industries*, 288 F. Supp. 2d 876, 881 (N.D. Ohio 2003) (citing *Payne v. Illinois Central Gulf R.R.,* 665 F. Supp. 1308, 1333 (W.D. Tenn. 1987)).

Ms. Blake is a full-time mail handler for the Postal Service.  Ms. Blake has not presented evidence that similarly situated non-Caucasian employees were treated more favorably with regard to the granting or denial of tri-party agreements.

First, many of the employees Ms. Blake relies upon as comparators hold different positions of employment than Ms. Blake; are governed by different collective bargaining

-20-

agreements; and/or, are not full-time mail handlers and therefore their schedules are not tied to the bid process.[9] Second, Ms. Blake takes issue with the fact that at least one employee was granted a tri-party that lasted longer than ninety days. However, this presents a distinction without a difference. While Ms. Blake was required to complete an additional request form, she did not work her assigned schedule for most of 2004 and in fact received hours and days off for months and months at a time.[10] Third, Ms. Blake cites instances in which employees have been granted tri-parties relative to changes in start time. Ms. Blake seeks weekend days off and daytime work hours, altering her Tour schedule. Assignments to a particular Tour, with particular days off, are related to seniority and determined through the bidding process. She has never been denied a request to change her start time. Fourth, Ms. Blake asserts that at least one employee is working outside of his bid or that he is on a tri-party agreement, and is arriving and leaving late by two hours. Even if that were the case, of which there is no evidence, Ms. Blake is asking to work the day shift and have weekends off which is not comparable. Finally, Ms. Blake does not address the fact that similarly situated employees, Caucasian and Black, have been

---

[9]

In her deposition in her case against the Union, Ms. Blake admitted that Tonia Burgess, Richard Calhoun, Tyrone Griggs, Arthur Hodges, Willie Pittman, and Monica Brown had greater seniority than she did. (Blake Deposition in Case No. 1:05 CV 649, at pp. 33, 35, 35, 40, 47, and 70-72.) Further, Ms. Blake admitted that no other mail handler with a seniority date after hers has been able to obtain a bid on Tour 2 since her Annex job was abolished in 2002. (Id. at 60.) Mrs. Blake identified a number or "casual employees who she believed had better work schedules, but she admitted that casuals are not full-time union mail handlers and receive lower pay without the benefits she receives. (Id. at 176.) Mrs. Blake did not identify any comparable full-time African-American mail handlers who she believes received the type of preferred work assignment which she claims had been denied to her.

[10]

Further, the requirement that Ms. Blake complete an additional request form does not rise to the level of adverse employment action necessary for a claim under Title VII.

granted and denied tri-party agreements or given limited ones on different occasions.

Ms. Blake has failed to present evidence to this Court that similarly situated Black employees were treated more favorably relative to the granting of tri-party agreements. Accordingly, Ms. Blake has not satisfied a prima facie case of discrimination for purposes of Title VII.

### 3.     No Evidence of Pretext.

Even had Ms. Blake presented evidence sufficient to satisfy a prima facie case of race discrimination, she has not presented evidence of pretext sufficient to defeat the Postal Service's legitimate non-discriminatory reason for denying some of Ms. Blake's requests for temporary schedule modification.  The Postal Service asserts that denials of Ms. Blake's requests for tri-party agreements were based upon operational needs, specifically staffing considerations, mail volume and the number of requests from other employees seeking temporary schedule changes. Ms. Blake has presented no evidence that the reasons offered by the Postal Service are pretextual. A majority of Ms. Blake's numerous requests for temporary schedule changes were in fact granted and there is no evidence that the few denials of her requests were the result of any discriminatory animus on the part of the postal service.   Therefore, Ms. Blake's discrimination claim cannot withstand summary judgment.

### B.     Hostile Environment/Retaliation.

Although her Complaint is not clear, the deposition testimony and Affidavit submitted by Ms. Blake appear to allege a claim of either hostile environment discrimination or retaliation. The Postal Service has addressed Ms. Blake's allegations as a hostile environment claim. However, under either theory of recovery, Ms. Blake fails to allege facts sufficient to withstand

summary judgment.

A plaintiff may establish a violation of Title VII by proving that the alleged race discrimination created a hostile or abusive work environment. *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 752 (1998)*; Meritor Savings Bank v. Vinson*, 477 U.S. 57, 66 (1986); *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 825 (6th Cir. 1997). Discrimination in this form occurs "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Savings Bank*, 477 U.S. at 65). To establish a prima facie case, a plaintiff must show that (1) she was a member of a protected racial class; (2) she was subject to unwelcome racial harassment; (3) the harassment was based on her race; (4) the harassment created a hostile work environment; and, (5) the employer failed to take reasonable care to prevent and correct any harassing behavior. *Faragher v. City of Boca Raton,* 524 U.S. 775 (1998); *Williams v. General Motors Corp.*, 187 F.3d 553, 560-61 (6th Cir. 1999).

The objectionable environment must be both objectively and subjectively offensive: one that a reasonable person would find hostile or abusive and one that the Plaintiff did, in fact, perceive to be hostile or abusive. *Faragher v. Boca Raton*, 524 U.S. 775, 788-89 (1998) *(citing Harris v. Forklift Systems, Inc*., 510 U.S. 17, 21 (1993)). The hostile work environment must be determined by looking at the totality of the circumstances, including the following: the frequency of the conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and, whether it unreasonably interferes with an employee's work performance. *Harris,* 510 U.S. 17, 23. Isolated incidents are insufficient to support a claim for

-23-

hostile work environment.  *Morris*, 201 F.3d 784, 790. As noted by the United States Supreme

Court, Title VII is not a "general civility code."  *Faragher*, 524 U.S. at 788.

      To establish a claim of retaliation, the plaintiff must put forth a prima facie case, showing

that: (1) she engaged in activity protected by Title VII; (2) the exercise of her civil rights was

known to the defendant; (3) thereafter, the defendant took an employment action adverse to the

plaintiff; and (4) there was a causal connection between plaintiff's protected activity and the

adverse action.  *Allen v. Michigan Department of Corrections,* 165 F.3d 405, 411 (6th Cir. 1999);

*Christopher v. Stouder Memorial Hosp*., 936 F.2d 870, 877 (6th Cir. 1991).

      Ms. Blake offers the following, outlined in her affidavit and discussed during deposition,

as evidence of hostile environment and/or retaliation: (1) the director of education at her

daughter's school allegedly unsuccessfully attempted to call Ms. Blake concerning her daughter;

(2) a supervisor reprimanded her for wearing improper shoes; (3) a supervisor asked Ms. Blake

questions in response to a request for time-off from work to prepare her EEO complaint;[11] (4)

unidentified co-workers allegedly hid Ms. Blake's timecard; (5) a co-worker allegedly

confronted Ms. Blake regarding a rumor that the co-worker had improperly clocked others out

for overtime; (6) a co-worker allegedly told Ms. Blake to stay home; and, (7) a supervisor

informed Ms. Blake that she could not prepare for her lawsuit during working hours, per Postal

Service policy.  She states that the "situation at work was stressful."  In addition to the above,

Ms. Blake states that she was denied the opportunity to work overtime.

      First, the actions complained of, some of which have no evidentiary support, do not rise

---

[11]

The supervisor allegedly asked "Why do you need this?  Why are you coming at me
now?  Why are you (sic) this?"

-24-

to the level of "hostile environment" contemplated under Title VII.  That is, the actions complained of are not sufficiently severe or pervasive to alter the conditions of the Plaintiff's employment and create an abusive working environment.  More important, there has been no evidence presented to this Court that any of the actions outlined above have anything to do with Ms. Blake's race.  Second, there is no evidence of a causal connection between the actions complained of above and Ms. Blake's EEO Complaints and/or lawsuit.  A causal connection is necessary to sustain a claim for retaliation.  Even if the actions complained of could be termed adverse, there is simply no evidence that these incidents were in any way the result of Ms. Blake's exercise of her civil rights.[12]

Accordingly, to the extent that Ms. Blake intended to raise claims of hostile work environment and/or retaliation, there are no genuine issues as to any material fact and summary judgment is appropriate.

### CONCLUSION

For the reasons stated above, the Defendant's Motion for Summary Judgment (Document #31) is hereby GRANTED.

IT IS SO ORDERED.

 s/Donald C. Nugent
DONALD C. NUGENT
United States District Judge

DATED: February 9, 2006

---

[12]See Footnote 2, supra.

-25-